FILED

09/04/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2018

## STATE OF TENNESSEE v. WILLIAM COLE NICHOLSON

**Appeal from the Circuit Court for Montgomery County**
**No. 41400749     William R. Goodman, III, Judge**

_____

**No. M2017-01761-CCA-R3-CD**

_____

The defendant, William Cole Nicholson, appeals his Montgomery County Circuit Court jury conviction of aggravated sexual battery. He challenges the sufficiency of the evidence supporting the element of unlawful sexual contact and the weight of the evidence supporting the guilty verdict. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Kenneth W. Merriweather (on appeal); and Jeffry S. Grimes (at trial), Clarksville, Tennessee, for the appellant, William Cole Nicholson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; John W. Carney, District Attorney General; and Kimberly Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Montgomery County Grand Jury charged the defendant with one count of aggravated sexual battery arising from an incident involving the defendant's step-daughter. At his April 2016 trial, a jury found the defendant guilty as charged.

At trial, S.N., the defendant's wife and mother of the victim,[1] testified that she and the defendant married in November 2008. S.N. had five children when she married the defendant. S.N. said that the defendant treated her children "[a]s if they were

_____

[1]     To protect the anonymity of the minor victim, we refer to both the victim and her mother by their initials.

his own." The defendant was in the Army, and S.N. and her children moved to Clarksville with the defendant in 2010. S.N. testified that in 2012, during the defendant's second deployment, her relationship with the defendant changed, and she told the defendant that she wanted a divorce. Despite S.N.'s request for a divorce, when the defendant returned from his deployment, he continued to help co-parent her children. S.N. stated that the defendant moved out of their shared house in February 2013, and, in April or May of that same year, the defendant moved into an apartment on South Lancaster in Clarksville ("the apartment") that he shared with a roommate. The defendant had the master bedroom in the apartment with a bathroom adjacent to his room.

S.N. testified that the victim, L.M., was 12 years old when the defendant moved to the apartment. All of S.N.'s children visited the defendant at the apartment, and two of her children, including L.M., would spend the night. S.N. testified that the defendant and L.M. had a "Dad and daughter" relationship and were "very close." L.M. would visit the defendant at the apartment "[e]very weekend, if not every other weekend" and would spend the night. In the apartment, the defendant had a twin bed and a futon for the children to use when staying the night.

S.N. further testified that she learned of the incident with the defendant and L.M. through a written note. Initially, L.M. denied the incident with the defendant. When S.N. first learned of the incident, she remained in contact with the defendant because she "didn't want to believe" the allegations. After the incident, L.M. was admitted to Cumberland Hall for mental health treatment. Although no official diagnosis was made, medical professionals observed L.M. and found her behaviors to indicate "borderline schizophreni[a], multiple personality and depression." S.N. testified that these behaviors did not arise until after the incident with the defendant. S.N. stated that she was not present for L.M.'s mental health evaluations but was told that L.M. had been "hearing voices since the incident happened." S.N. learned of L.M's potential mental health issues in 2013.

L.M. testified that after the defendant moved to the apartment, she would visit him and spend the night "[e]very or every other weekend." When she spent the night, L.M. slept on the futon in the defendant's room. L.M. said that one evening, when she was 12 years old and visiting at the defendant's apartment, she took a shower in the bathroom in the defendant's room. Although she usually dressed in the bathroom after a shower, this time she forgot a shirt and came out of the bathroom wearing her underwear and wrapped in a towel to look for her clothes in her bag. L.M. testified that her bag was next to the futon in the bedroom.

While holding the towel around her, L.M. bent over to look in her bag. L.M. testified that she knew at that time that the defendant was behind her so she "shuffled to the side a little bit" because she thought she was in the defendant's way.

L.M. testified that the defendant, while standing behind her, "placed his hands around [her] hips and . . . put his thighs against [hers] and [she] could feel the outline of his privates on [her] backside." L.M. clarified that by "backside" she meant her buttocks. L.M. further testified that the defendant's "privates" felt hard. L.M. said that after the defendant pressed himself against her, she said "what are you doing, you little weirdo," to which the defendant replied "don't give me attitude." The defendant then went to take a shower.

L.M. testified that she did not tell S.N. about the incident right away because she was scared. Instead, L.M. wrote a note to her best friend to tell her about the incident because "[i]t was becoming a really big burden on my heart." The note was later sent to S.N. L.M. said that when first asked about the incident, she denied it because she "was scared and . . . didn't want to . . . break up the family"; but L.M. later realized that she "had to make sure everybody knew" what had happened before she was sent to Cumberland Hall. L.M. said that she told the doctors at Cumberland Hall that she heard voices. She had been hearing voices since "[a] little while after the incident." She would hear these voices when she got "extremely upset." L.M. acknowledged that it was possible that she "heard voices" without realizing that they were not real voices, but she also stated that she did not begin to hear voices until after the incident.

DeMone Chestnut, the investigating officer with the Clarksville Police Department assigned to the defendant's case, testified about the interview he conducted with the defendant during the course of the investigation. Mr. Chestnut stated that the defendant initially denied all allegations but later "admitted to putting [L.M.] in a bad situation." Mr. Chestnut further testified that during the interview the defendant "admitted to grabbing [L.M.] and pressing his penis up against her buttocks[,] . . . admitted that he did have an erection," but the defendant denied that it was for sexual gratification. Mr. Chestnut also said that the defendant said that L.M. did not lie and that "[e]verything she said was true." During the interview, the defendant wrote a letter of apology to L.M., which Mr. Chestnut gave to the evidence custodian. The jury reviewed the letter. The relevant portion of the letter is as follows:

> I also want you to know that I am actually proud of you for doing what you believed was right, and I hope you continue doing so. I hope that you can forgive me one day and that you, your sisters, and brother, and I can hopefully start building a relationship again.

The defense re-called Mr. Chestnut and questioned him about his testimony regarding the defendant's admissions of touching L.M. with his penis and having an erection. When asked whether the defendant specifically admitted to "grabb[ing] hold of [L.M.] and rubb[ing] his private area on her buttocks," Mr. Chestnut responded: "He admitted what [L.M.] stated was truthful." Mr. Chestnut also testified that the defendant

admitted that "he may have bumped into [L.M.]." Mr. Chestnut said that the defendant never admitted to having an erection during the incident. The defense played a portion of the video recording of Mr. Chestnut's interview with the defendant for the jury.[2] In the interview, the following exchange occurred:

> Mr. Chestnut: "You're saying that your penis did touch her, that you did have an erection, but it wasn't done purposely and you wasn't, you're not sexually aroused by her?"
>
> The defendant: "Correct."[3]

Mr. Chestnut testified that he understood the defendant's answer of "[c]orrect" as a response to all three questions.

The defendant testified that during the incident in question, L.M. came out of the bathroom wrapped in a towel to get her clothes. The defendant stated that he "went to get out of her way . . . there was a small space and I bumped into her." The defendant went on to say that he tried to give L.M. space because he "was uncomfortable with her state of dress."

The defendant testified that he never admitted to having an erection and that his initial denial of knowing anything about the situation was because he "had no reason to think of this particular situation" when L.M. said that he had touched her. The defendant also testified that when Mr. Chestnut asked him the series of three questions during the interview, the defendant's response of "[c]orrect" was intended only as a response to the last question of "you're not sexually aroused by [L.M.]?" The defendant's answer was not intended as an admission to all three questions. Additionally, the defendant stated that he wrote the letter to L.M. "to try to bring reconciliation to the family" and did not intend it as an admission of sexual assault.

The defendant also testified that after L.M. went to Cumberland Hall, he learned that she "hears things" and "had been hallucinating." The defendant stated that L.M. had exhibited odd behavior previously. Specifically, she would "pull her hair" and "get very–almost over the top upset" over "[w]hatever pushed her buttons at that time." The defendant testified that he and S.N. had discussed mental health treatment for L.M.

---

[2]    The parties stipulated to the introduction of a DVD of the video recorded interview as an exhibit "subject to the condition that only the designated portion . . . played during the testimony of Mr. Chestnut, will be available for the jury to view." The transcript does not indicate which portion of the video was played for the jury, but other evidence included with the DVD shows the times of 47:00-1:03:08 and 01:12:18-01:13:28 on a handwritten note signed by counsel for both parties. We will presume those times indicate the portion of the video played for the jury.

[3]    This exchange occurred at mark 1:12:50-1:13:00 on the video recording.

prior to the incident, but S.N. "didn't follow through on it."

On cross-examination the defendant stated that L.M. was bent over when he moved behind her. The defendant acknowledged that it is possible that he had an erection at that time. The defendant testified he did not recall putting his hands on L.M. when he moved past her but stated that "[a]nything is possible." On redirect, the defendant testified that he did not intend to touch L.M. in a sexual manner.

The jury accredited the State's evidence and found the defendant guilty of aggravated sexual battery. The trial court imposed a sentence of eight years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the evidence at trial is insufficient to support his conviction.

*Sufficiency of the Evidence*

The defendant contends that the State failed to present sufficient evidence to establish that he had unlawful sexual contact with L.M. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Aggravated sexual battery, as relevant to this case, is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] . . . [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's [or] the defendant's . . . intimate parts, if that intentional touching can be

-5-

reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Additionally, "'[i]ntimate parts' includes . . . the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

The State's evidence established that when L.M. was 12 years old, the defendant stood behind L.M., put his hands on her hips, and pressed his erect penis against her buttocks. The defendant's placing his hands on L.M.'s hips and pressing himself against her is sufficient to show unlawful sexual contact. The jury was free to infer from the evidence that the defendant acted intentionally. Furthermore, the defendant's actions could "be reasonably construed as being for the purpose of sexual arousal or gratification," *see* T.C.A. § 39-13-501(6), especially in light of his having an erection. The jury resolved any issues of credibility and chose to accredit L.M's testimony and the State's evidence, as was its prerogative. Accordingly, we hold that sufficient evidence exists to support the defendant's conviction for aggravated sexual battery.

*Conclusion*

The evidence is sufficient to support the defendant's conviction of aggravated sexual battery. We affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE